Robertson
v.
Bethune.

### Robertson *against* Bethune and Boorman.

R. the owner of a ship, entered into a written agreement with B. to carry certain goods in the vessel, from *New-York* to *Surinam*, and to bring back 200 hogsheads of molasses from that place to *New-York;* and B. agreed to pay R. 2,600 dollars for the freight, but if accident should prevent the delivery of the return-cargo, then he was to pay only 1,300 dollars, and R. engaged that the vessel should lay 35 days at *Surinam* to unload and reload.

THIS was an action of *assumpsit*. The declaration stated, " that whereas, on the 29th of *September*, 1805, the plaintiff being owner of the brig *Ohio*, then lying in the port of *New-York*, it was agreed between him and the defendants, that the plaintiff should receive on board of the said brig, to be delivered to one *William A. Carstairs*, at *Surinam*, 100 casks of codfish, 20 barrels of pickled fish, 100 kegs and firkins, 200 hogshead shooks and headings ; and also should receive on board of the said brig at *Surinam*, to be delivered to the defendants in *New-York*, 200 hogsheads of molasses, and that 75 days after the delivery of the return cargo, the defendants would pay to the plaintiff 2,600 dollars therefor, provided, that if any accident should prevent the delivery of the return cargo, the defendants should pay to the plaintiff 1,300 dollars, for the freight of the outward cargo, 75 days after its delivery at *Surinam* should be ascertained ; and

The vessel stayed the 35 days, and the return-cargo not being ready, she waited 20 days longer, at the request of the agent and consignee of B. but who had no controul over the vessel. B. paid the 2,600 dollars freight. In an action of *assumpsit* brought by R. against B. to recover a compensation for the detention of the vessel beyond the time stipulated, in the nature of demurrage, it was held, that as the written contract contained no stipulation to pay demurrage, and no implied *assumpsit* could arise from the act of the assignee of the goods, who was not authorised to bind B. to pay demurrage, the plaintiff was not entitled to recover.

the plaintiff further agreed with the defendants to allow them 35 good working days at *Surinam*, for discharging the outward cargo, and loading the homeward cargo; and whereas the plaintiff, in pursuance of the said agreement, on the 19th day of *October*, 1805, re--ceived on board the said brig, the said outward cargo, and therewith proceeded to *Surinam*, where the said vessel arrived on the 20th of *November*, 1805, and remained until the 24th day of *January*, 1806, and whereas, on the 24th day of *January*, in consideration that the plaintiff, at the special instance and request of the defendants, had permitted the said brig to remain at *Surinam*, until the said 24th day of *January*, the said defendants undertook and promised the plaintiff to pay him so much money as he reasonably deserved to have for the demurrage of the said brig beyond the said 35 days, when thereunto, afterwards, requested; and the plaintiff averred that they reasonably ought to have, &c. Plea, *non assumpsit*.

The cause was tried before Mr. Justice *Spencer*, at the sittings, in the city of *New-York*, on the 9th of *December*, 1807. The written *memorandum* of the agreement between the parties was produced, and was, in substance, as stated in the declaration, with the following clause: " Should *William A. Carstairs* wish to ship more than 200 hogsheads of molasses, he is to have a preference to any other shipper, at the current rate of freight, excepting what *I. A. Robertson* may wish shipped on his own account."

The master testified, that he arrived at *Surinam*, on the 18th of *November*, 1805, and there delivered the outward cargo to *William A. Carstairs*, the agent of the defendants. The unlading was completed in five days after his arrival; and 20 days from the time of his arrival, would have been amply sufficient to have completed the

unloading and reloading of the vessel. *Carstairs* shipped on board, at various times, on account of the plaintiff, 43 hogsheads of molasses, and which were marked when on board, on the 24th of *December*, 1805, by the clerk of *Carstairs*, with the letter *R*. The casks containing the molasses were made of materials belonging to the plaintiff, which formed a part of the outward cargo. The master, immediately after his arrival, delivered letters from the defendants to *Carstairs*, which contained a copy of the above mentioned agreement, and instructions as to the procuring the return cargo. The master frequently urged *Carstairs* to be expeditious in sending the return cargo, stating the orders from the plaintiff to make dispatch, the injury to the vessel from worms, and the high expenses at that place. *Carstairs* generally answered, that he would be as expeditious as possible, and once replied, " that the defendants were not going to pay 2,600 dollars, and not have their full cargo on board." On the 3d of *January*, 1806, the master protested against the detention, but *Carstairs* still detained the brig, until the 26th of *January*, 1806, for though the last parcel of the return cargo belonging to the defendants (the whole being 170 hogsheads) was on board on the 18th of *January*, the master and crew were busily employed in preparing for the voyage home, until the time of sailing. The master further testified, that the sole ground of the detention of the vessel, after the third day of *January*, 1806, was the delay of *Carstairs*, in procuring the return cargo for the defendants. *Carstairs* was the consignee of the plaintiff's share of the outward cargo, but had nothing to do with the vessel, though the master was instructed to call on him for the necessary supplies of money, without which he could not conveniently leave *Surinam*. The master had two offers of a return cargo at *Surinam* from other persons, which he would have accepted, had it not been for his situation in regard to the consignee of the defendants. The 200 hogsheads, in addition to the 43 hogsheads belonging to the plaintiff, would not have

made a full cargo for the vessel. The letter of instructions from the plaintiff to the master was read in evidence. The rate of demurrage was proved by several witnesses. The defendants' counsel moved for a nonsuit, on the ground that the evidence did not support the declaration ; but that question was reserved, and the jury, under the direction of the judge, found a verdict for the plaintiff, for 18 days demurrage, from the 3d to the 21st day of *January*, 1806.

The point reserved and argued was, whether the plaintiff was entitled to a compensation, in nature of demurrage, for the time the vessel was detained at *Surinam*, after the 35 lay days, allowed by the agreement between the parties, had expired ?

*Griffin*, for the plaintiff. It is proved, by the master of the vessel, that the detention of the vessel, after the expiration of the 35 days, was by request of the agent of the defendants, and for their benefit. It is a general principle of law, founded in equity and justice, that where a person has expended his time and labour, for another, at his request, that he shall be entitled to a reasonable compensation. Suppose a person hires a carriage to take him from *New-York* to *Philadelphia*, and back again, and on his arrival at the latter place, he requests the carriage to wait for him a fortnight, is the owner to receive no compensation for the expense, and loss of time during his stay there ? [He was stopped by the court, who desired to hear the other side.]

*Pendleton* and *D. A. Ogden*, contra. This was a *general* ship ; and the contract was to carry certain articles for a certain freight. There was no agreement to pay demurrage, nor was there evidence of any such agreement. The right of demurrage arises out of the contract of charter-party, where the entire ship is let to freight, in consequence of a particular clause usually inserted for that purpose.* Here the plaintiff stipulated to wait 35 days at *Surinam*, but nothing was said as to any allowance if the vessel stayed a longer time to obtain her homeward

* *Abbott*, 156.

* Page 158.

† 1 Wm. Black.
151.

cargo. In the case of a charter-party, where the whole ship is let to freight, the merchant has the entire controul and direction of the ship, and if he detains her beyond the time stipulated, he must pay demurrage: But there is not an instance of demurrage to be found, in the case of a general ship. It is remarkable, that no case is to be met with of an action of *indebitatus assumpsit*, brought to recover *demurrage*. In the case of *Jamieson* v. *Laurie*, mentioned by *Abbott*,* the entire ship was let to *Jamieson & Co.* and they had the whole direction and controul of her. This is manifest, from their letter of instructions to the master. As it was a suit in *Scotland*, it is not easy to say what was the particular form of action; but it was, most probably, a special action on the case.

*Hume* v. *The East India Company*,† was an action of covenant on a charter-party, and the Company were permitted to detain the ship a year, on paying demurrage at a certain rate, and if the ship did not arrive in safety, and deliver her whole cargo, the Company were to pay no freight or demurrage. Here the defendants did not bind themselves to put a homeward cargo on board, but they stipulated to pay the freight at all events. But admitting that the action could be maintained for the detention in the nature of demurrage, yet there is no evidence from which a promise to pay can be implied. The agreement of the parties was reduced to writing, and nothing can be intended beyond the written contract. It is not pretended that the defendants themselves delayed the vessel; but merely that the master, at the request of the consignee, consented to stay after the expiration of the 35 days. It was a request with which the master might comply or not, as suited his convenience. His consent to stay was a mere voluntary courtesy, for which the plaintiff can have no legal claim on the defendants for a compensation. The consignee or agent of the defendants was merely authorised to procure a return cargo; he had no power to bind the defendants to pay demurrage

for the detention of the vessel, beyond the period fixed by the contract. As to the case put of a carriage ; suppose the case to be, that the owner of the carriage agrees to take a passenger to *Philadelphia* for a certain price, and on his arrival there, consents to wait for him to return at the same fare, there would be no implied contract to pay the owner of the carriage for staying.

*Colden,* in reply. The case of *Jamieson* v. *Laurie,* if I understand it, is precisely in point, though it is impossible to say what was the form of action in that case. If the defendants cannot recover in the present form of action, they are without a remedy. Whether this was a general ship or not, does not vary the plaintiff's right. It is enough that the vessel has been detained by the request of the defendants or their agent. There is nothing extraordinary in this action. Like all other actions on *implied assumpsits,* it is founded on the principle, that the law presumes that every man undertakes to perform, what reason and justice require of him. *Demurrage* is the payment or compensation for the delay of a ship, by the request of the merchant. This is also a suit for delay, in the nature of demurrage ; and the only difference between this case and that of a charter-party is, that the rate of compensation, or *demurrage,* has not been fixed by the contract ; but the defendants are not the less liable on the *quantum meruit,* to make a reasonable compensation to the plaintiff.

VAN NESS, J. This was a general ship, in which the defendants had no other interest than what they derived under the special contract. The plaintiff engaged to carry to *Surinam* certain specified articles, and to bring back 200 hogsheads of molasses, for which the plaintiff agreed to pay 2,600 dollars. The contract provides, among other things, that the defendants should be allowed 35 working days at *Surinam,* for discharging the outward and loading the homeward cargo ; and it contains this further stipulation, that if any accident should prevent the delivery of the return cargo, (and this must mean a

delivery of it within the 35 days) the defendants should, in that event, be liable to pay 1,300 dollars for the freight of the goods out. When, therefore, the return cargo was not ready to be put on board, within the 35 days, the master was no longer bound to wait for it ; but from that moment the contract terminated, to all intents and purposes, and both parties were absolved from all future liability under it. No provision was made, however, for any compensation for the detention of the ship, in case the 200 hogsheads of molasses should not be put on board within the 35 days. In charter-parties, there frequently is a stipulation that the ship shall, if required, wait a further time to unload and reload, for which the merchant covenants to pay a certain daily sum for demurrage. There is no stipulation of that kind in the present instance, and I cannot perceive any thing in the case from which a promise to pay for the detention of the ship ought to be implied. No obligation ought to be intended beyond those which are imposed by the written contract.

*Carstairs*, the consignee of the cargo, (but who had nothing to do with the ship) had no authority to bind the defendants by express stipulation to pay for the detention of the ship. But if he had such power, there is no evidence that he did enter into such a stipulation. The master says, that when he urged *Carstairs* to be expeditious in providing the molasses, *Carstairs* told him that the *defendants were not going to pay* 2,600 *dollars,* and not have their full cargo ; and that if he insisted on sailing, *Carstairs* said he would turn over to the defendants the 43 hogsheads of molasses which had been put on board for the plaintiff. It is evident, from these expressions, that *Carstairs* had no intention to make the defendants liable for any thing beyond the terms of the written contract, of which he had a copy ; and it is fairly to be inferred, from the master's silence as to any extra compensation for the detention of the ship during the whole of the transaction, that he also had no idea that his owners would have a right to demand it. There can be no doubt but that the

master waited for the molasses, with no other view than to secure the freight mentioned in the written agreement, to be paid for the homeward cargo.

I cannot conceive upon what ground the authority of *Carstairs* to bind the defendants to pay for the detention of the ship, can be maintained. An express authority from the defendants is not pretended, and it certainly does not result from his being *consignee* of the goods. He was, it is true, to furnish the return cargo, but this could give him no power over the ship. If he had a right to render the defendants responsible for the detention of the ship, for one day, he might for a longer period, and this right would be the same, whether the defendants had 5 or 500 hogsheads of molasses. In this way, *Carstairs* might have subjected the defendants to the payment of a sum, amounting to double or treble the value of the molasses. And cases may easily be conceived, where a mere consignee of the goods (if the doctrine contended for by the plaintiffs should be recognised) might ruin the merchant. The case of *Jamieson & Co.* v. *Laurie*, differs very essentially from the present. In that case, there was evidently a letting of the whole ship. *Jamieson & Co.* are said to have sent the ship to *Cronstadt*. They gave the captain his letter of instructions, and they consigned the ship to *Atkyns & Co.* From these and other facts in that case, *they* appear to have had the exclusive management, possession and direction of the ship during the voyage. Another and a prominent fact in that case, is, that the ship was detained by *Atkyns & Co.* who were the *consignees of the ship*, and this forms also a striking distinction between the two cases.

The case of the hiring of a carriage, put in the argument, is not analogous to the one now under consideration. There, also, is a letting of the *whole* carriage, the custody and direction of which is parted with by the owner, for the exclusive use and benefit of the party to whom it is let. Nothing is to be inferred against the defendants from the circumstance of their receiving the molasses on

the return of the ship. They considered themselves bound by the special contract to pay, and have therefore paid the 2,600 dollars, which they supposed was the extent of their liability. There is reason to suspect that the present demand on the part of the plaintiff was an after thought. If he had supposed the defendants were responsible for it, it is not very probable that he would have delivered to them the molasses, until this demand, as well as the 2,600 dollars, was paid.

I am of opinion, therefore, that a judgment of nonsuit ought to be entered.

KENT, Ch. J. and YATES, J. were of the same opinion.

SPENCER, J. From the facts appearing in this case, it is evident that *Carstairs*, the agent of the defendants, detained the vessel for their benefit, from the 3d to the 23d day of *January*; for though the defendants' portion of the return cargo was on board on the 18th of *January*, the master and crew were employed from that time until the sailing of the vessel, in adjusting the cargo, and getting ready for sea. It remains to inquire, whether this action can be maintained for the detention.

The general principle cannot be denied, that wherever one person does an act beneficial to another, at his request, or by his consent, and which act is not intended to be gratuitous, an action of *assumpsit* will lie for a compensation for the act performed. It was strongly urged, on the argument, that demurrage can only be claimed, where there has been a charter-party, or letting to hire of the entire ship, and then as a matter of stipulation by way of penalty ; but no authority was produced to support this doctrine ; and I think that the contrary is established in the case of *Jamieson* v. *Laurie*. (*Abbott*, 158.) That case arose in *Scotland*, and was decided upon the principles of the *English* law, with a view to render the law of *Scotland*, in that respect, conformable to the law of *England*, and was finally decided in the House of Lords.

In that case, there was no charter-party, and the only evidence of the contract was a letter of instructions from *Jamieson & Co.* to the master. The vessel ought to have sailed on the 1st of *September*, on her return voyage ; but she waited for the homeward cargo to be shipped by *Jamieson & Co.* at the instance of their agent in *St. Petersburgh*, until the 28th of *October*, when the vessel cleared out. But it is said, that Messrs. *Atkins, E. Rigeul & Co.* the merchants at *St. Petersburgh*, were the consignees of the ship. It is true, that the ship was addressed to them by *Jamieson & Co.* who were rendered responsible, not because the merchants, to whom the ship was addresssd, had any positive controul over the ship, but because the master had waited at the request of the agents and correspondents of *Jamieson & Co.* It was admitted on all hands, that the master might have returned empty, or have obtained another cargo, after the 1st of *September;* and the House of Lords finally decided that *Jamieson & Co.* should pay the usual freight, and a compensation in the nature of demurrage, from the 1st of *September*, until the vessel cleared out, and was ready for sea. I can see no material difference between that case, and the one now before the court. They both proceed on the principle, that the plaintiff sustained an injury in remaining with his vessel, waiting for the defendants' cargo, by the direction or means of their agent, and that the party who has enjoyed the benefit, is bound to make compensation for the injury.

The form of action appears to me to be the only one adapted to the case, and I know of no other which would so well comprehend the plaintiff's claim.

Some objection was made to the admissibility of the evidence, as to the extent of the injury arising from the detention. It was the only evidence that the nature of the case admitted. The demurrage is necessarily made up of various items, such as the wages and provisions of the crew, the wear and tear of the vessel, and loss of

ALBANY,
August, 1808.

Reade
v.
Commercial
Ins. Company.

employment during the detention.  As there can be no accurate estimate on the subject, it is proper to receive the opinions of persons conversant in such matters, and acquainted with the nature of the trade.

I am of opinion, therefore, that the plaintiff ought to have judgment.

THOMPSON, J. not having heard the argument in the cause, gave no opinion.

Judgment of nonsuit.